## LLOYD M. ENGSTROM v. WILBERT CARLSON PLUMBING, HEATING & SHEET METAL AND ANOTHER.

134 N. W. (2d) 321.

March 12, 1965—No. 39,401.

*Friedman & Friedman,* for relator.

*Montague, Applequist, Lyons, Nolan, Donovan & Knetsch,* for respondents.

SHERAN, JUSTICE.

Certiorari to review a decision of the Industrial Commission denying an employee's petition for an order vacating an award based on stipulation.

The stipulation is dated January 5, 1962, and relates to a compensation claim based on an alleged employment-connected accident occurring August 23, 1960. By its terms, the employee was to be awarded (1) medical and hospital expenses incurred and to be incurred; (2) in addition to $900 in compensation previously paid, the sum of $6,500. The order approving the stipulation provides that—

"* * * the same shall constitute a full, final and complete settle-

ment of any and all claims of the employe herein for compensation benefits resulting from his alleged personal injury * * * except, such further medical care and treatment as may be reasonably necessary * * *."

The power of the Industrial Commission to vacate an award stems from Minn. St. 176.461, which provides that an award of the Industrial Commission may be set aside by it for cause. Whether there is sufficient cause to justify the vacation of the award ordinarily rests in the sound discretion of the commission.[1]

A review of (a) the proceedings and the medical reports which preceded the stipulation of January 5, 1962, and (b) the medical reports concerning the subsequent course of employee's physical condition filed in support of and in opposition to the motion to vacate gives support to the Industrial Commission's conclusion that the employee, having chosen to terminate the adjudication of his claim by a negotiated settlement, has failed to show sufficient cause to permit relitigation of the contested issues in the case.

### Prestipulation Data

The claim petition originally filed September 30, 1960, alleged the occurrence of an employment-connected accident on August 24, 1960, and temporary total disability from that date for an estimated 7 months. But the amended claim petition filed September 22, 1961, alleges temporary total disability from August 24, 1960, to May 11, 1961, and permanent total disability thereafter. By answer to the original and to the amended petition, and by the terms of the stipulation for settlement, the employer and his insurer have at all times specifically

---

[1] See, Bomersine v. Armour & Co. 225 Minn. 157, 30 N. W. (2d) 526; Batchelder v. Northwestern Hanna Fuel Co. 225 Minn. 250, 30 N. W. (2d) 530; Graif v. Alexander, 226 Minn. 519, 33 N. W. (2d) 702; Guptill v. Conlon Const. Co. 239 Minn. 185, 58 N. W. (2d) 264; Dudansky v. L. H. Sault Const. Co. 244 Minn. 369, 70 N. W. (2d) 114; Nelson v. C. F. Scully Const. Co. 252 Minn. 518, 90 N. W. (2d) 903; Anderson v. Sandberg Poultry Farm, 263 Minn. 360, 116 N. W. (2d) 585; Jacobson v. Uptown Transfer & Storage Co. 268 Minn. 336, 129 N. W. (2d) 41; Wold v. Decca Distributing Co. 269 Minn. 319, 130 N. W. (2d) 585.

denied that the employee sustained a personal injury arising out of and during the course of his employment with Wilbert Carlson.

In August 1956, while working for the Foley Construction Company, Mr. Engstrom sustained an employment-connected back injury. Surgery was performed by Dr. Swedberg to relieve this condition, and compensation for a 10-percent permanent partial disability of the back was awarded. On August 9, 1957, Mr. Engstrom sustained a second employment-connected back injury, which was relieved by surgical procedure performed by Dr. William G. Atmore, an orthopedist at the Duluth Clinic. Compensation for an additional 10-percent permanent partial disability of the back was then allowed. The employment with Wilbert Carlson Plumbing, Heating & Sheet Metal commenced in July 1960.[2]

Mr. Engstrom testified in proceedings before a referee of the Industrial Commission held during November 1961 that on August 24, 1960, he had assisted two other employees of Carlson in removing a 350-pound radiator from the second story of a house in Duluth and loading it onto his employer's truck. Within 4 or 5 minutes after doing so he experienced severe low back pain which with the passage of time radiated to the lower extremities, prompting him to consult again with Dr. Atmore on August 29, 1960.

Dr. Atmore first saw Engstrom in October 1957, when a spinogram was taken which revealed "a defect at the fourth level, although he had had a previous laminectomy." He said that it was then felt "that there was a possibility that this defect was scarring, and he was subjected to another laminectomy during the month of October, 1957." Disc protrusion was found.

At the time of the August 29, 1960, examination, "Mr. Engstrom reported that on August 27, 1960, that following some heavy lifting at work he developed a recurrence or a pain in his lower back much like the back pain had been previous which radiated down the left leg, and this pain continued at the time of my examination." Conserva-

_____

[2]The name of Mr. Engstrom as an employee with a preexisting physical impairment was not registered with the Industrial Commission as it might have been under the provisions of Minn. St. 176.13(c).

tive treatment was unavailing. A spinogram disclosed a deformity at the L4-5 interspace. He was "subjected to another laminectomy, and because of his previous laminectomy, it was felt that he should have a L3-S1 fusion, which was carried out." X rays taken in January 1961 were suggestive of "continuing motion in the region of the top of the graft." X-ray films taken on April 19, 1961, "showed fusion." However, there was still "a suggestion of motion, but to a lesser degree, in other words, it appeared to be tightening." X rays taken on November 6, 1961, "showed significant improvement, and it was supposed that he would be able to return to work within a reasonable period of time. Perhaps not exceeding over two months." He testified at the November 1961 hearing "that when the healing process is completed, the permanent partial disability should be established at the end of that healing time, and should be somewhere in the neighborhood of 30% of the spine," representing an additional 10-percent permanent partial disability to the back.

Dr. Atmore, in November 1961, recognized the possibility of further difficulty in the surgical area as these questions asked by the employee's attorney and his answers indicate:

"Q. And isn't it true that in view of the fact that some 14 months have now gone by, in fact almost 15 months, since the operation, and the graft hasn't taken yet, there is a possibility that the graft will not take even though it has shown progression?

"A. Yes, that is a possibility.

"Q. If the graft does not take Mr. Engstrom will continue to be totally disabled, would he not?

"A. I would feel he would be."

Mr. Engstrom was examined in behalf of the employee by Dr. Meyer Z. Goldner of Minneapolis on June 2 and July 12, 1961. As the result of the first examination, Dr. Goldner was of the opinion, based on X-ray examination, that there was considerable motion present between L4-5 and stated: "Since it has been nine months from the time of his most recent surgery, *I doubt if any additional spontaneous improvement will occur.*" (Italics supplied.)

Based on his examination of July 12, 1961, including spinogram and discogram studies carried out at that time, it was his impression—

"* * * that Mr. Engstrom's best chance of effecting further improvement would be by having the bone graft removed at the L4-5 interspace level and a careful exploration of this interspace on both the left and right sides be carried out. After this has been accomplished a secondary fusion extending from L4 to L5 and the sacrum and overlapping bone grafts would then be carried out."

Dr. Goldner concludes a report dated August 24, 1961, summarizing his findings as a result of the June 2 and July 12 examinations with this opinion:

"*If nothing further is done* I would say that he has a 35 per cent loss of function of the spine as a permanent partial disability factor and that he will have to limit his activities to very light type work." (Italics supplied.)

Subsequent Course

Our attention has been directed to a medical report by Dr. Goldner dated January 4, 1962, in which he states, "I believe that Mr. Engstrom will require further surgery"; a report dated June 19, 1962, concerning a June 15, 1962, examination in which Dr. Goldner states that X rays of the lumbar spine then taken show "what appears to be solid bony union between L5 and the sacrum, but all of the segments above that level show motion"; and one dated February 7, 1963, in which Dr. Goldner notes for the first time that "it appears that a portion of the bone graft extending from L4 to L5 has been removed surgically."[3]

An affidavit of Dr. Atmore considered by the commission states:

"* * * Lloyd M. Engstrom has a 40% permanent partial disability to the back and that said 40% permanent partial disability represents an over-all permanent partial disability of 40% of the back and * * *

---

[3]This observation of Dr. Goldner reconciles with a report to the employee's attorney dated March 28, 1963, from Dr. Atmore in which he states: "The above-named patient's last laminectomy was on 8-3-62. At that time he had a repair of a pseudoarthrosis of a loose fusion."

20% of said 40% is attributable to the alleged injury while in the employ of Wilbert Carlson Plumbing Company."

A letter from Dr. Atmore to the employer's attorney dated October 17, 1963, concludes with this paragraph:

"The patient since the date of my last report on May 2, 1963, on the basis of my examination of October 7, 1963, has shown no change. On May 2, 1963 a rating of 40 per cent permanent partial disability of the back was given. This was a 10 per cent increase over his previous 30 per cent due to the last surgical procedure."

A report from Dr. John M. Wolff of the Duluth Clinic dated August 19, 1963, was a part of the record before the Industrial Commission. In this letter Dr. Wolff, an internist, notes that he had his first occasion to see Mr. Engstrom on July 2, 1963. After reciting the tests and examination made by him, he reported:

"I believe he has a post-traumatic rheumatoid spondylitis and arachnoiditis. I believe the injuries were the triggering mechanisms and that chronic infection plays some role in keeping the inflammation going. Nervous tension, inability to sleep because of pain, inability to get adequate rest, excessive weight bearing on his spinal joints all aggravate the condition. * * * I would consider him totally and permanently disabled from post-traumatic rheumatoid spondylitis with associated arachnoiditis."

There is nothing to explain the statement, "I believe the injuries were the triggering mechanisms," although in the letter reference is made to the fact that Mr. Engstrom had a history of back injuries occurring in August 1956, August 1957, and August 1960, and it is noted that surgical explorations in August of 1960 and 1962 were negative for discs, with only inflammatory scarring seen.

### Conclusion

From a review of this testimony, it is our conclusion that:

(1) The employer has disputed any relationship between plaintiff's present physical condition and any employment-connected accident occurring while the employee was working for Wilbert Carlson and does so still.

(2)  The settlement made in January 1962 was substantial in amount, fixing upon the employer and his insurer the obligation to pay for all medical and hospital expenses incurred and to be incurred on account of the 1960 surgical procedure and, in addition to the $900 already paid as compensation, to pay $6,500 by way of a lump-sum settlement.[4]

(3)  Although Dr. Atmore's anticipation that there would be fusion at the L4-5 level without surgical intervention may be disputed, the possibility that such fusion might not take place was called to the attention of the employee and his attorney by reports of Dr. Goldner and by the reservations of Dr. Atmore himself.

(4)  The estimate of disability made by Dr. Atmore does not represent any substantial change in his prior disability estimate.

(5)  The disability estimate of Dr. Goldner, apparently made on the assumption that fusion difficulty could be anticipated, was 35 percent of the back—an increase of but 15 percent beyond the 20-percent permanent partial disability of the back on account of which the employee had received compensation previously.

(6)  Although Dr. Wolff in his letter expressed the opinion that the employee is presently suffering from a permanent total disability, his first examination of the employee occurred almost 3 years after the claimed employment-connected accident here involved, and his letter is not so written as to compel the conclusion that even in his judg-

---

[4]Minn. St. 176.101, subd. 3, provides in part: "For the permanent partial disability from the loss of a member the compensation during the healing period, but not exceeding 104 weeks, shall be 66 2/3 percent of the difference between the daily wage of the worker at the time of injury and any wages he is able to earn in his partially disabled condition; and thereafter and in addition thereto, compensation shall be that named in the following schedule:

\*     \*     \*     \*     \*

"(39)  For permanent partial disability resulting from injury to the back, 66 2/3 percent of the daily wage at the time of injury for that proportion of 350 weeks which is represented by the percentage of such permanent partial disability as is determined from competent testimony adduced at a hearing before a referee, a commissioner, or the commission."

ment the employee's present physical status is attributable to the claimed employment-connected accident of August 1960.

Based upon this review of the record, the determination of the Industrial Commission is affirmed.

Affirmed.

